U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

DEC 1 2 2023

TONY R. MOORE, CLERK
BY _____
           DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. |
| | * | 18 U.S.C. § 1347 |
| | * | 18 U.S.C. § 2 |
| VERSUS | * | |
| | * | 6:23-cr-00290-01 |
| | * | Judge Joseph |
| SHANONE CHATMAN-ASHLEY  (01) | * | Magistrate Judge Whitehurst |

## INDICTMENT

THE GRAND JURY CHARGES:

### COUNTS 1 - 5
### HEALTH CARE FRAUD
### [18 U.S.C. §§ 1347 and 2]

**AT ALL TIMES HEREIN RELEVANT:**

### The Medicare Program

1.    The Medicare Program ("Medicare") was a federal health insurance program, affecting commerce, that provided benefits to persons who were 65 years of age and older or disabled. Medicare was administered by the United States Department of Health and Human Services, through its agency, the Centers for Medicare and Medicaid Services.

2.    Medicare was a "health care benefit program" within the meaning of Title 18, United States Code, Section 24(b), and a "Federal health care program" within the meaning of Title 42, United States Code, Section 1320a-7b(f).

3. Individuals who qualified for Medicare benefits were commonly referred to as "beneficiaries." Each beneficiary was given a unique Medicare identification number.

4. As part of the Medicare enrollment process, health care providers, including nurse practitioners ("providers"), submitted enrollment applications to Medicare. The Medicare provider enrollment application, CMS Form 855B, required a provider, or an authorized representative of the provider, to certify that the provider would comply with all Medicare-related laws, rules, and regulations, including that the provider "w[ould] not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare" and "w[ould] not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

5. If Medicare approved a provider's application, Medicare assigned the provider a Medicare provider number. A provider with a Medicare provider number could submit claims to Medicare to obtain reimbursement for medically necessary items and services rendered to beneficiaries. Medicare providers were given access to Medicare manuals and service bulletins describing procedures, rules, and regulations.

6. When seeking reimbursement from Medicare, providers submitted the cost of the service provided together with the appropriate "procedure code," as set forth in the Current Procedural Terminology Manual or the Healthcare Common Procedure Coding System ("HCPCS").

7. Medicare included coverage under component parts. Medicare Part B covered, among other things, physician services, outpatient care, and durable medical equipment.

## Durable Medical Equipment

8. Durable medical equipment ("DME") was reusable medical equipment such as orthotic devices, walkers, canes, and hospital beds. Orthotic devices were a type of DME that included knee braces, back braces, shoulder braces, and wrist braces (collectively, "braces"), as well as orthotic sleeves.

9. Medicare reimbursed DME providers for medically necessary items and services rendered to beneficiaries. In claims submitted to Medicare for the reimbursement of provided DME, providers were required to set forth, among other information, the beneficiary's name and unique Medicare identification number, the equipment provided to the beneficiary, the date the equipment was provided, the cost of the equipment, and the name and provider number of the provider who prescribed or ordered the equipment.

10. Medicare would pay claims for the provision of DME only if the equipment was ordered by a licensed provider, was reasonable and medically necessary for the treatment of the diagnosed and covered condition, and was actually provided to beneficiaries. For certain types of orthotics, such as knee braces, Medicare required that a provider conduct an in-person examination of a beneficiary. Knee braces ordered without an in-person examination were not medically necessary. Medicare claims were required to be properly documented in accordance with Medicare rules and regulations. Medicare would not reimburse providers for claims that were procured through the payment of kickbacks and bribes.

## Telemedicine

11. Telemedicine was a means of remotely connecting patients to health care providers by using telecommunication technology, such as the internet or a telephone.

12. Medicare deemed telemedicine an appropriate means to provide certain health care related services ("telehealth services") to beneficiaries, including, among other services, consultations and office visits, only when certain requirements were met. These requirements included, among others: (a) that the beneficiary was located in a rural area (outside a Metropolitan Statistical Area or in a rural health professional shortage area); (b) that the services were delivered via an interactive audio and video telecommunications system; and (c) that the beneficiary was at a practitioner's office or a specified medical facility—not at a beneficiary's home—during the telehealth service furnished by a remote provider.

13. Telehealth services could be covered by and reimbursable under Medicare, but only if telemedicine was generally appropriate, as outlined above, and only if the services were both ordered by a licensed provider and were reasonable and medically necessary to diagnose and treat a covered illness or condition.

## The Defendant and Relevant Entities

14. The defendant, **Shanone Chatman-Ashley**, a resident of St. Landry Parish, Louisiana, was a licensed nurse practitioner in the state of Louisiana. In 2016, **Chatman-Ashley** applied for and obtained a Medicare provider number, and in doing so, agreed to abide by the terms, laws, and regulations of Medicare.

15. Company 1 [ACC] was a New York limited liability company owned and operated by Individual 1 and Individual 2 that purported to do business in New Jersey; and elsewhere.

16. Company 2 [AIM] was a Maryland corporation owned and operated by Individual 1, Individual 2, and others, that purported to do business in New Jersey and elsewhere.

17. Company 3 [EnVision It] and Company 4 [Royal Physicians] were Georgia limited liability companies operated by Individual 3 that purported to do business in Georgia and elsewhere.

18. **Chatman-Ashley** worked as an independent contractor for Company 1, Company 2, Company 3, and Company 4 (collectively, the "Telemedicine Companies"), to provide purported telehealth services to beneficiaries.

## The Scheme to Defraud

19. **Chatman-Ashley** executed a scheme and artifice to defraud Medicare by submitting, and causing to be submitted, over $2 million in false and fraudulent claims to Medicare for medically unnecessary DME, for which Medicare reimbursed over $1 million.

20. Specifically, **Chatman-Ashley** ordered knee braces, suspension sleeves and other braces for beneficiaries who she had not examined in-person and who had not been examined by a treating provider. These orders for braces and sleeves, as **Chatman-Ashley** knew, were: (a) induced in part by the payment of kickbacks and

bribes; (b) not the product of a doctor-patient relationship and examination; (c) not medically necessary; and (d) not eligible for reimbursement by Medicare.

### Purpose of the Scheme

21. The purpose of the scheme was for **Chatman-Ashley** to unlawfully enrich herself by:

　　a.　Receiving kickbacks and bribes in exchange for the furnishing and arranging for the furnishing, and arranging and recommending the purchasing and ordering of, DME to beneficiaries by various DME providers;

　　b.　submitting and causing the submission of false and fraudulent claims to Medicare, including for services purportedly rendered to beneficiaries located in the Western District of Louisiana and elsewhere;

　　c.　concealing the submission of false and fraudulent claims to Medicare, and the solicitation and receipt of kickbacks and bribes; and

　　d.　diverting proceeds of the fraud for the personal use and benefit of the defendant.

### Manner and Means of the Scheme

22. The manner and means by which **Chatman-Ashley** sought to accomplish the objects and purpose of the scheme and artifice included, among others:

23. **Chatman-Ashley** certified to Medicare that she would comply with all Medicare rules and regulations, including that she would not knowingly present or cause to be presented a false or fraudulent claim for payment to Medicare, or submit or

cause to be submitted claims with deliberate ignorance or reckless disregard of their truth or falsity, and would not violate the Federal Anti-Kickback Statute.

24. Despite this certification, from in or around July 2017 through in or around August 2019, **Chatman-Ashley** signed more than one-thousand orders for DME for beneficiaries, including for beneficiaries located in the Western District of Louisiana, typically in the absence of a pre-existing provider-patient relationship, without an in-person examination, regardless of medical necessity, and frequently based solely on a short telephone conversation or no conversation at all, in exchange for kickbacks and bribes from the Telemedicine Companies ("fraudulent orders").

25. The fraudulent orders were based on information derived from, among other things, telemarketing and in-person solicitations of beneficiaries by representatives of call centers and other companies, working with the Telemedicine Companies, which advertised that beneficiaries suffering from back, joint, knee, and other pain were eligible to receive braces at low or no cost to the beneficiaries. The beneficiaries would provide the representatives, who were not trained medical professionals, personal information in response to the solicitations, including their names, unique Medicare identification numbers, and medical history. The representatives would, provide the information to the Telemedicine Companies, which, in turn, made the information available, typically electronically, to **Chatman-Ashley**, which formed the basis of the fraudulent orders.

26. **Chatman-Ashley** further concealed and disguised the scheme by preparing or causing to be prepared false and fraudulent documentation and submitting

or causing the submission of false and fraudulent documentation to Medicare. Specifically, **Chatman-Ashley** submitted and caused to be submitted false and fraudulent documents falsely certifying that (a) she had consulted with the beneficiaries; (b) the beneficiaries "want[ed], "would like," or "inquired" about braces; (c) she personally conducted "evaluation[s]", "examination[s]", and "assessment[s]" of the beneficiaries, including performing various in-person examinations and diagnostic tests; and (4) she "instructed" beneficiaries on "compliance" and use of braces. In fact, beneficiaries were actively solicited for braces; many explicitly refused the braces; **Chatman-Ashley** never saw the beneficiaries face-to-face; she had either a brief telephone conversation with these beneficiaries or none at all; and she did not conduct the examinations and diagnostic tests as represented.

27. In exchange for the fraudulent orders, **Chatman-Ashley** received kickbacks and bribes from the Telemedicine Companies, knowing that her orders for medically unnecessary DME would be used to support false and fraudulent claims to Medicare.

28. In order to conceal the kickbacks and bribes, payments made from certain Telemedicine Companies, including Company 1, to **Chatman-Ashley**, were falsely described in documentation as payments for "hours" when, in fact, **Chatman-Ashley** was paid by Company 1 per DME order signed.

29. In total, **Chatman-Ashley** caused the submission of over $2 million in false and fraudulent claims to Medicare for DME, specifically knee braces, suspension sleeves, and other braces, that were ineligible for Medicare reimbursement because the

braces were not medically necessary, were procured through the payment of illegal kickbacks and bribes, and were often not actually supplied to the beneficiaries. Of these claims, Medicare reimbursed the DME providers over $1,000,000.

### The Offenses

30. Beginning in or around July 2017, and continuing through in or around August 2019, in the Western District of Louisiana, and elsewhere, **Chatman-Ashley**, aiding and abetting, and aided and abetted by, others known and unknown to the Grand Jury, in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of material false and fraudulent pretenses, representations, and promises, money owned by, and under the custody and control of, Medicare, in connection with the delivery of and payment for health care benefits, items, and services.

31. On or about the dates and in the approximate amounts set forth below, within the Western District of Louisiana, **Chatman-Ashley**, for the purpose of executing and attempting to execute the fraudulent scheme described above, knowingly and willfully submitted, and caused to be submitted, to Medicare, the following false and fraudulent claims for payment:

| Count | Beneficiary | Code Billed | Claim Number | Approx. Date Submitted | Date Services Purportedly Rendered | Approx. Amount Billed | Approx. Amount Paid |
|---|---|---|---|---|---|---|---|
| 1 | K.M. | L1851 | 118360711640000 | 12/26/2018 | 12/21/2018 | $1,455.30 | $1,140.96 |

9

| Count | Beneficiary | Code Billed | Claim Number | Approx. Date Submitted | Date Services Purportedly Rendered | Approx. Amount Billed | Approx. Amount Paid |
|---|---|---|---|---|---|---|---|
| 2 | L.A. | L1851 | 119042776351000 | 02/11/2019 | 02/05/2019 | $1,750.00 | $1,372.00 |
| 3 | M.J. | L1851 | 119045700891000 | 02/14/2019 | 01/31/2019 | $875.48 | $686.37 |
| 4 | J.P. | L1851 | 119057708236000 | 02/26/2019 | 02/22/2019 | $2,000.00 | $1,259.30 |
| 5 | J.R. | L1851 | 119105708367000 | 04/15/2019 | 04/09/2019 | $1,791.21 | $1,404.34 |

Each of the above is a violation of Title 18, United States Code, Sections 1347 and 2.

A TRUE BILL:

**REDACTED**

GRAND JURY FOREPERSON

BRANDON B. BROWN
United States Attorney

*/s/ Kelly P. Uebinger*

KELLY P. UEBINGER, La Bar No 21028
Assistant United States Attorney
800 Lafayette Street, Suite 2200
Lafayette, Louisiana 70501
Telephone: (337) 262-6618

GLENN S. LEON
Chief
Criminal Division, Fraud Section
United States Department of Justice

KELLY Z. WALTERS, D.C. Bar No 1023492
Trial Attorney
Criminal Division, Fraud Section
United States Department of Justice
1400 New York Ave., NW
Washington, DC 20005
Telephone: (202) 941-4535